UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
**NICHOLAS BERNHARD, RALPH NATALE,
KIRK CONAWAY, and ROY KOHN as TRUSTEES
OF HEALTH FUND 917 AND THE LOCAL 868
PENSION FUND; HEALTH FUND 917; and
LOCAL 868 PENSION FUND,**

                             **CERTIFICATION**
                             10-CV-2736 (SJF)(ETB)

                             Plaintiffs,

       -against-

**THE MAJOR AUTOMOTIVE COMPANIES, INC.,
d/b/a MAJOR CHEVROLET, INC., and MAJOR
DODGE, INC.; HAROLD BENDELL; MAJOR
CHEVROLET INC; and MAJOR DODGE, INC.
and HAROLD BENDEL**

                        Defendant.
-------------------------------------------------------X

Susan Bruno, Esq., declares under penalty of perjury pursuant to 28 U.S.C. 1746 that the following is true and correct:

1.    I am a member of the bar of this Court and an associate of the firm Law Offices of Campbell & Associates, P.C., attorneys for Plaintiffs in this action.

2.    Attached hereto as Exhibit "A" are the Fourth Amendment to the Agreement and Declaration of Trust of the Local 868 IBT Pension Fund and the Fifth Amendment to the Agreement and Declaration of Trust of Health Fund 917.

3.    Attached hereto as Exhibit "B" are pages 39-40 of the transcript of the deposition of Harold Bendel.

4.    Attached hereto as Exhibit "C" are pages 29-30 of the transcript of the deposition of Harold Bendel.

5.    Attached hereto as Exhibit "D" are pages 11-12 of the transcript of the deposition of Harold Bendel.

6.    Attached hereto as Exhibit "E" are articles from the internet relating to Harold Bendel.

7.    Attached hereto as Exhibit "F" are Findings Report letters dated August 3 and 5, 2009.

8.    Attached hereto as Exhibit "G" is page 70 of the transcript of the deposition of David Moskowitz.

9.    Attached hereto as Exhibit "H" is Defendants' Notice of Deposition of a 30(b)(6) witness.

10.     Attached hereto as Exhibit "I" are pages 47-52 of the transcript of the deposition of Joann Emmons.

11.     Attached hereto as Exhibit "J" is a report of the NYS Department of State of Major Dodge, Inc.

Wherefore, the affirmant requests that this Court deny Defendants' motion for summary judgment, and award Plaintiffs the costs of defending against this motion, and for such other relief as this Court deems just.


Dated:        August 18, 2011
              Floral Park, New York

                                        Susan Bruno
                                        Susan Bruno, Esq.
                                        Law Offices of Campbell &
                                        Associates, PC
                                        99 Tulip Avenue, Suite 404
                                        Floral Park, New York 11001
                                        (516) 352-0300



G:\New Documents\Local.917.Funds\Collections\Major.chev.dodge.audits.2010\Majors SJ motion\cert Bruno.wpd

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NICHOLAS BERNHARD, RALPH NATALE,
KIRK CONAWAY, and ROY KOHN as TRUSTEES
OF HEALTH FUND 917 AND THE
LOCAL 868 PENSION FUND; HEALTH
FUND 917; and LOCAL 868 PENSION
FUND,                                                      10-CV-2736 (SJF)(ETB)

                            Plaintiffs,

        -against-

THE MAJOR AUTOMOTIVE COMPANIES, INC.,
d/b/a MAJOR CHEVROLET, INC., and MAJOR
DODGE, INC.; HAROLD BENDEL; MAJOR
CHEVROLET INC; and MAJOR DODGE, INC.
and HAROLD BENDEL

                       Defendant.
------------------------------------------------------------X


EXHIBITS



Law Offices of Campbell & Assoc., P.C.
99 Tulip Avenue
Floral Park, New York 10011

# EXHIBIT A

FOURTH AMENDMENT
TO THE
AGREEMENT AND DECLARATION OF TRUST
OF THE
LOCAL 868 IBT PENSION FUND

* * * *

Pursuant to Article XII, Section 1 of the Agreement and Declaration of Trust of the Local 868 IBT Pension Fund, restated as of May 1, 2003, ( hereinafter "Trust Agreement"), the undersigned, being the Trustees duly appointed thereunder, hereby further amend such Trust Agreement as agreed by the Board at their meeting on August 12, 2008, as follows:

1.   Section 1 of Article VII shall be renumbered as Section 2 of Article VII. Sections 2 through 12 of Article VII shall be renumbered consecutively as Sections 3 through 13 of Article VII.

2.   Article VII is hereby amended by adding a new Section 1, which shall read as follows:

"Contributions Constitute Plan Assets: Title to all monies accrued, owing, due or paid into the Fund shall be vested in and remain exclusively in the Trustees and shall constitute plan assets as of the date that their payment is due to the Fund; outstanding and withheld contributions shall constitute plan assets as of the date that their payment is due to the Fund."

3.   New Section 9 of Article VII shall be amended to read as follows:

"The cost of any payroll audit shall be paid by the Employer if the audit discloses additional contributions to be due in an amount equal to, or exceeding, five percent (5%) of the contributions actually paid by the Employer for the period of the audit. For purposes of determining whether an Employer shall pay the costs of an audit, where the Employer employs participants of the Plan at more than one location and there are multiple payroll audits, contributions due and paid for all locations audited shall be calculated on a payroll audit basis and shall also be aggregated for purposes of this section.  The Employer shall pay the costs of the audit for any payroll audit where findings exceed five percent (5%) of the contributions actually paid for the audit period and for all payroll audits where aggregate findings exceed five percent (5%) of the contributions actually paid in the aggregate."

4.   New Section 11(b)  of Article VII shall be amended to read as follows:

"(b) compound interest on the unpaid Contributions at such rate as the Trustees may fix from time to time or in particular cases;"

5.      New Section 11( c) of Article VII shall be amended to read as follows:

"( c) an amount equal to the greater of (i) compound interest on the unpaid Contributions at the rate specified in (b) above; or (ii) liquidated damages of twenty percent (20%) ( or such higher percentage as the law allows) of the amount of the Unpaid Contributions; and"


Dated:      New York, New York
            August 12, 2008


_____          _____
John Vacca                       Kirk Conoway

_____          _____
Mark Ruggiero                    Roy Kohn


G:\New Documents\Local.868.Pension\Amendments\Amend.No. 7.wpd

FIFTH AMENDMENT
TO THE
AGREEMENT AND DECLARATION OF TRUST
OF THE
HEALTH FUND 917

\* \* \* \*

Pursuant to Article XII, Section 1 of the Agreement and Declaration of Trust of Health Fund 917, restated as of August 1, 2003, ( hereinafter "Trust Agreement"), the undersigned, being the Trustees duly appointed thereunder, hereby further amend such Trust Agreement as agreed by the Board at their meeting on August 12, 2008, as follows:

1.      Section 3(f) of Article V is hereby amended to read as follows:

"To verify the accuracy of statements and information submitted by the Employers and Employees on Contribution forms, claim forms and other forms. In furtherance of this right and duty, the duly appointed auditor for the Fund shall, upon request, be permitted to examine the payroll records, wage cards or any other pertinent records of any persons covered by the Collective Bargaining Agreement.  If, after a benefit payment has been made, it is discovered that any Employee, Dependent, or provider of service shall have made a false statement of material fact in connection with such benefits, the Trustees shall have the right to recover any payments that were incorrectly made based on such false statement from the Employee, Dependent, and/or provider, including, but not limited to, by offset against future benefits. In addition, the Trustees have the right to recover any erroneous or incorrect payment(s) to any Employee, Dependent or provider of service."

2.      Section 3(ii) of Article V is hereby amended to read as follows:

"To adopt a Subrogation, Assignment of Rights and Reimbursement Policy and Procedure which provides for the repayment of benefits to the Fund from any recovery which has been, or will be, received by a Participant or Beneficiary, whether in full or partial recovery of its claims, or from any overpayment to a Participant or Beneficiary in a manner and in an amount as determined solely by the Trustees and which further provides for the Fund's right to litigate its claim against the Participant, Beneficiary, any responsible third party or an insurance company, including to the Fund's right to intervene in any litigation and to require a Participant or Beneficiary to consent to the Fund intervening in such litigation as a condition of receiving benefits under the Plan. Any amount received by a Participant, Beneficiary or their representative (including their attorney) that is due to the Fund under this provision shall be deemed to be held in trust by them for the benefit of the Fund until paid to the Fund.

3.      Section 1 of Article VII shall be renumbered as Section 2 of Article VII. Sections 2 through 12 of Article VII shall be renumbered consecutively as Sections 3 through 13 of Article VII.

4.      Article VII is hereby amended by adding a new Section 1, which shall read as follows:

"Contributions Constitute Plan Assets: Title to all monies accrued, owing, due or paid into the Fund shall be vested in and remain exclusively in the Trustees and shall constitute plan assets as of the date that their payment is due to the Fund; outstanding and withheld contributions, and any other monies due to the Fund, shall constitute plan assets as of the date that their payment is due to the Fund."

5.      Renumbered Section 9 of Article VII shall be amended to read as follows:

"The cost of any payroll audit shall be paid by the Employer if the audit discloses additional contributions to be due in an amount equal to, or exceeding, five percent (5%) of the contributions actually paid by the Employer for the period of the audit. For purposes of determining whether an Employer shall pay the costs of an audit, where the Employer employs participants of the Plan at more than one location and there are multiple payroll audits, contributions due and paid for all locations audited shall be calculated on a payroll audit basis and shall also be aggregated for purposes of this section. The Employer shall pay the costs of the audit for any payroll audit where findings exceed five percent (5%) of the contributions actually paid for the audit period and for all payroll audits where aggregate findings exceed five percent (5%) of the contributions actually paid in the aggregate."

6.      Renumbered Section 11(b)  of Article VII shall be amended to read as follows:

"(b) compound interest on the unpaid Contributions at such rate as the Trustees may fix from time to time or in particular cases;"

7.      Renumbered Section 11( c) of Article VII shall be amended to read as follows:

"( c) an amount equal to the greater of (i) compound interest on the unpaid Contributions at the rate specified in (b) above; or (ii) liquidated damages of twenty percent (20%) ( or such higher percentage as the law allows) of the amount of the Unpaid Contributions; and"

2

Dated:      New York, New York
            August 12, 2008


_____          _____
John Vacca                         Kirk Conoway


_____          _____
Mark Ruggiero                      Roy Kohn


G:\New Documents\Local.917.Funds\Trust.Agreements\Health.Restate.03\Amend.No.5.wpd

3

# EXHIBIT B

Page 1

1
2  UNITED STATES DISTRICT COURT
3  EASTERN DISTRICT OF NEW YORK
4  - - - - - - - - - - - - - - - - - -x
5  NICHOLAS BERNHARD, RALPH NATALE, KIRK
   CONAWAY, and ROY KOHN as TRUSTEES OF
6  HEALTH FUND 917 AND THE LOCAL 917
   PENSION FUND; HEALTH FUND 917; and
7  LOCAL 917 PENSION FUND,
8                    Plaintiffs,
                                   10-CV-2736
9      -against-                   (SJF)(ETB)
10  THE MAJOR AUTOMOTIVE COMPANIES, INC.,
    d/b/a MAJOR CHEVROLET, INC., and MAJOR
11  DODGE, INC.; HAROLD BENDEL; MAJOR
    CHEVROLET INC; and MAJOR DODGE, INC.
12  and HAROLD BENDEL,
13                    Defendants.
14  - - - - - - - - - - - - - - - - - -x
15                    99 Tulip Avenue
                      Floral Park, New York
16
                      June 23, 2011
17                    2:11 p.m.
18
19          DEPOSITION of HAROLD BENDEL, a
20  Defendant in the above-entitled action,
21  held at the above time and place, taken
22  before Denise Posillico, a Shorthand
23  Reporter and Notary Public of the State
24  of New York, pursuant to the Federal
25  Rules of Civil Procedure.

Page 39

H. Bendel

1

2    Q.    Do you know who made the

3  decision not to pay the findings?

4        MS. BRUNO:  Is that better?

5        MR. LABUDA:  It's still calling

6    for a conclusion as to whether or not

7    there was a decision not to pay the

8    findings, as opposed to just not

9    paying the findings.  One is an

10   active omission and one is just an

11   omission.

12       MS. BRUNO:  Would you like me

13   to rephrase it?

14       MR. LABUDA:  Sure.

15   Q.    Do you know who made the

16 decision not to pay the findings prior to

17 today?

18       MR. LABUDA:  The same

19   objection, but you can answer.

20   A.    There was stuff we discussed

21 with our lawyer.

22   Q.    And I'm not going to ask you

23 the substance of your conversations, but

24 when you say "we" discussed with our

25 lawyer, that's you and who else?

1                         H. Bendel

2      A.      I guess, Bob Cottrell.

3      Q.      Okay.  Who has the authority to

4  determine whether to pay any part of the

5  findings?  Who gets to make that

6  decision?

7      A.      I guess, my brother.

8      Q.      Has your brother been in any of

9  these discussions that you've had on the

10  findings?

11      A.      No.

12      Q.      But your brother is the one who

13  will have that authority?

14      A.      Um-hum.

15      Q.      Has anybody spoken with your

16  brother about these findings?

17      A.      Not to my knowledge.

18      Q.      How will he make the decision,

19  if he doesn't know about it?  Will

20  someone be speaking to him about it?

21      A.      I guess at a certain point

22  Mr. Labuda might.

23      Q.      Do you have the authority to

24  direct that any part of these findings be

25  paid?

# EXHIBIT C

Page 1

1
2      UNITED STATES DISTRICT COURT
3      EASTERN DISTRICT OF NEW YORK
4      - - - - - - - - - - - - - - - - - - -x
5      NICHOLAS BERNHARD, RALPH NATALE, KIRK
       CONAWAY, and ROY KOHN as TRUSTEES OF
6      HEALTH FUND 917 AND THE LOCAL 917
       PENSION FUND; HEALTH FUND 917; and
7      LOCAL 917 PENSION FUND,
8                              Plaintiffs,
                                          10-CV-2736
9           -against-                     (SJF)(ETB)
10     THE MAJOR AUTOMOTIVE COMPANIES, INC.,
       d/b/a MAJOR CHEVROLET, INC., and MAJOR
11     DODGE, INC.; HAROLD BENDEL; MAJOR
       CHEVROLET INC; and MAJOR DODGE, INC.
12     and HAROLD BENDEL,
13                             Defendants.
14     - - - - - - - - - - - - - - - - - - -x
15                         99 Tulip Avenue
                           Floral Park, New York
16
                           June 23, 2011
17                         2:11 p.m.
18
19             DEPOSITION of HAROLD BENDEL, a
20     Defendant in the above-entitled action,
21     held at the above time and place, taken
22     before Denise Posillico, a Shorthand
23     Reporter and Notary Public of the State
24     of New York, pursuant to the Federal
25     Rules of Civil Procedure.

H. Bendel

Q.     Okay.   Were they authorized to decide what checks to make out and who to pay?

A.     Yes.

Q.     Was there anybody that they needed to report to on what would be paid?

A.     On a daily basis, no.

Q.     Was anybody authorized to go to the bank with a withdrawal slip and take money out of any of Major's accounts?

A.     No.

Q.     Who signed the checks for Major Chevrolet?

        MR. LABUDA:   Objection, compound and ambiguous, but you can answer.

A.     We had Jane, the office manager, my brother, myself and Adam Kohn and my daughter, Sky Bendel.

Q.     And by your brother you mean Bruce Bendel; am I correct?

A.     Um-hum.

Q.     Were double signatures required

Page 30

H. Bendel

1
2    for the checks?
3        A.    Yes, they were, other than
4    Bruce Bendel's signature.
5        Q.    So if you wrote a check on
6    behalf of Major --
7        A.    I'm sorry, I was -- my
8    signature is not -- a double signature is
9    not required by me.
10       Q.    Okay.  So double signatures
11   would be required then by Jane or Adam,
12   am I following you?
13       A.    By Jane or Adam together or Sky
14   Bendel.
15       Q.    Okay.  Now, the information you
16   just gave me for Major Chevrolet, would
17   that be the same if I asked you the same
18   questions for Major Dodge?
19       A.    Yes.
20       Q.    Are you aware or do you know
21   from personal knowledge that over time
22   Major remitted contributions to Health
23   Fund 917 and the pension fund on behalf
24   of some employees?
25       A.    Am I aware of it?

# EXHIBIT D

Page 1

1
2      UNITED STATES DISTRICT COURT
3      EASTERN DISTRICT OF NEW YORK
4      - - - - - - - - - - - - - - - - - -x
5      NICHOLAS BERNHARD, RALPH NATALE, KIRK
       CONAWAY, and ROY KOHN as TRUSTEES OF
6      HEALTH FUND 917 AND THE LOCAL 917
       PENSION FUND; HEALTH FUND 917; and
7      LOCAL 917 PENSION FUND,
8                              Plaintiffs,
                                     10-CV-2736
9           -against-                (SJF)(ETB)
10     THE MAJOR AUTOMOTIVE COMPANIES, INC.,
       d/b/a MAJOR CHEVROLET, INC., and MAJOR
11     DODGE, INC.; HAROLD BENDEL; MAJOR
       CHEVROLET INC; and MAJOR DODGE, INC.
12     and HAROLD BENDEL,
13                             Defendants.
14     - - - - - - - - - - - - - - - - - -x
15                    99 Tulip Avenue
                      Floral Park, New York
16
                      June 23, 2011
17                    2:11 p.m.
18
19              DEPOSITION of HAROLD BENDEL, a
20     Defendant in the above-entitled action,
21     held at the above time and place, taken
22     before Denise Posillico, a Shorthand
23     Reporter and Notary Public of the State
24     of New York, pursuant to the Federal
25     Rules of Civil Procedure.

Page 11

H. Bendel

1    that division?

2    A.    There is a parts manager, his

3    name is Tony.

4    Q.    Are there any other departments

5    in Major Chevy besides the ones you've

6    named?

7    A.    No.

8    Q.    And could you tell me, please,

9    again your job duties as manager for

10   Major Chevy?

11              MR. LABUDA:  Objection.  Asked

12         and answered.  You could answer it

13         again, though.

14   A.    I oversee the used car

15   department and at times the other

16   departments.

17   Q.    Under what circumstances would

18   you oversee the other departments?

19   A.    I would just have meetings and

20   have a general guidance as to where --

21   you know, where we're going and what

22   we're doing.

23   Q.    Is there a person or people to

24   whom the managers report?

H. Bendel

1

2    A.    I guess that would be me.

3    Q.    And is there a person to whom

4 you report?

5    A.    Yes.

6    Q.    And who would that be?

7    A.    Bruce Bendel.

8    Q.    Now, let's go to Major Dodge,

9 please.  Do you have a position with

10 Major Dodge?

11    A.    I guess so.

12    Q.    And what would that be?

13    A.    The same.  The equivalent that

14 I have at Chevy.

15    Q.    Used cars?

16    A.    No.  The same managers would

17 report to me.

18    Q.    So the managers of Major Dodge

19 would report to you and you would report

20 to Bruce Bendel?

21    A.    Right.

22    Q.    And is there anybody that Bruce

23 Bendel reports to?

24    A.    No.

25    Q.    Mr. Bendel, are you taking any

VERITEXT REPORTING COMPANY
www.veritext.com
212-267-6868          516-608-2400

# EXHIBIT E

Can you get a great deal on an orphaned Chrysler?

Page 1 of 2

Customer Service | My Account | Bookstore | Donate | Our Web Sites | Site Features

Expert • Independent • Nonprofit

**ConsumerReports.org**

News   Forums   Videos

News Only    Search

Cars | Appliances | Electronics | Home & Garden | Babies & Kids | Money | Shopping | Health

Home > News > Cars > Manufacturer > Chrysler

Top Product Ratings: Tires | Sedans | SUVs | Small Cars | GPS          SUBSCRIBER CONTENT

# News | Cars    Subscribe to Cars Feed

More Consumer News

| More

CHRYSLER
## Can you get a great deal on an orphaned Chrysler?
May 29, 2009 5:29 PM

When Chrysler announced plans two weeks ago to shed 25 percent of its dealer network by June 9th, the 789 retailers affected had more than 44,000 new Chrysler, Dodge, and Jeep vehicles sitting on their lots. Chrysler's move triggered some to immediately drop prices, as they tried to divest themselves of bloated inventories before the June 9 deadline.

Does that make this an especially good time to make a deal? As we've reported before, good prices can be found, though there are significant caveats to consider.

**Chrysler considerations**
The most significant caveat is that no Chrysler, Dodge, or Jeep models are recommended by *Consumer Reports*. Reliability has been below average for most, and others have scored too low in our testing.

That said, we understand that many people purchase non-recommended vehicles and car shoppers will be tempted by the aggressive pricing now available.

Those shoppers may be disappointed with the models left in stock. Harold Bendell is President of Major Auto World, a multi-branded dealership that sells Chrysler, Dodge, and Jeep along with other makes in Long Island City, NY. He pointed out that after months of discounts and rebates, buyers will likely find much of the remaining inventory to be increasingly made up of less-sought-after models, or those in unpopular colors or lacking popular features.

As for prices, Bendell says things can only get discounted so far. "There are some people coming in thinking they can get a super-duper deal, 50 cents on the dollar. They can't."

That may change, as the June 9 deadline fast approaches, particularly at smaller, single-line dealerships, if not big ones like Major World. Prior to the bankruptcy filing, Chrysler officials urged dealers to take additional inventory and said doing so would increase their good standing with the automaker. Some then lost their franchises anyway. According to Bendell, any cars that remain on dealer lots after their franchise is lost must be sold as used cars. Additionally, the Chrysler won't extend rebates or incentives on those models.

Chrysler said it is helping to find homes for any unsold inventory at its remaining dealerships, but Bendell remains skeptical, particularly if those models are older inventory or less-popular models.

☒ Chrysler-deal

**SUBSCRIBE ONLINE**
Join today & get 24/7 online access to:
- Expert Ratings
- Buying advice
- Much, much more!

CLICK HERE TO
**SUBSCRIBE**

**Featured Stories**

Breaking the Ice: How Consumer Reports tests blenders

Expert Ratings

    Previous                    Next

Can you get a great deal on an orphaned Chrysler?

Page 2 of 2

A quick Internet search found widely varying prices among Chrysler, Dodge, and Jeep dealers, but we did see some deep discounts, especially on 2008 models. We found a new 2008 Dodge Avenger SE listed for $15,542, a discount of $4,818. The same dealer was offering a 2008 Dodge Caravan SE discounted $7,425 to $21,900.

Good news for buyers looking to trade is that in spite of losing their franchises, many Chrysler and Dodge dealers are planning to continue in the used car business and are looking for used inventory.

"Most of the Chrysler dealers I know are buying at auction" said Bendell. "There is a ready market for used cars, prices are astronomically high."

Be especially wary of buying a "new" car once it must be sold as a used model. The U.S. government agreed to back warranties on new cars sold during the Chrysler bankruptcy, but if the model is sold as used the compelling "Lifetime" powertrain warranty protection is not available, as the warranty is non-transferrable. Plus, financing rates are also likely to be higher for a used car than a new one.

While it may be tempting to save big on a new car now, remember the risk you may face bigger losses later in depreciation and increased repair costs. (Should you intend to keep a vehicle longer than five years, depreciation may not be a factor, though reliability should given even higher priority.) Purchasing a vehicle from an automaker going through bankruptcy exposes the consumer to further risks, as there may not be the traditional lemon law and product liability protection.

No matter what vehicle you desire, be sure to do your homework to ensure you are buying a good, safe, reliable model with average or better project owner costs. In this economy, it is best to minimize the surprises, and the research can be done in minutes using our interactive new car selector.

We will continue to monitor the news from Chrysler and GM, reporting here in the Cars blog and also updating advice and news on the Auto Crisis hub.

—Jim Travers

**For complete Ratings and recommendations on appliances, cars & trucks, electronic gear, and much more, subscribe today and have access to all of ConsumerReports.org.**

More About: Cars | Chrysler | Dodge | Jeep | All Cars News

## Post a comment

Sign in to comment

## Comments: 0

Expand All

### Nobody Tests Like We Do



Our testers put 100s of products through their paces at our National Testing and Research Center. Learn more about how we test for:

Performance    Safety    Reliability

Watch video

### Cars News Categories

Auto shows
⊞ Behind the Ratings
Car maintenance
⊞ Car parts & accessories
⊞ Car shopping
⊞ Car types
GPS Navigation
⊞ Manufacturer
⊞ Other motor vehicles
⊞ Safety
Tires

# Bloomberg Businessweek

Get our new FREE iPad app now




MAKING SENSE OF VOLATILITY.
WHAT EVERY INVESTOR NEEDS TO KNOW.
Watch now at ml.com/webcast ▸

Merrill Lynch
Wealth Management
THE POWER OF THE RIGHT ADVISOR.

 Report content errors on this page

SPECIALTY RETAIL                                    August 18, 2011 9:11 AM ET
## Major Automotive Companies Inc.

| Snapshot | People |

Overview    Board Members    Committees

**KEY EXECUTIVES FOR MAJOR AUTOMOTIVE COMPANIES INC.***

| Name | Board Relationships | Title | Age |
|---|---|---|---|
| Bruce Bendell | 30 Relationships | Chairman of the Board, Chief Executive Officer, President, Chief Operating Officer and Acting Chief Financial Officer | 57 |
| Eric Keltz | No Relationships | Secretary | |
| Harold Bendell | No Relationships | Senior Executive of Major Dealer Group | 63 |

**MAJOR AUTOMOTIVE COMPANIES INC. BOARD MEMBERS***

| Name | Board Relationships | Primary Company | Age |
|---|---|---|---|
| Bruce Bendell | 30 Relationships | Major Automotive Companies Inc | 57 |
| Alan A. Pearson | 4 Relationships | Major Automotive Companies Inc | 66 |
| David Edelstein | 4 Relationships | Major Automotive Companies Inc | 58 |
| Jeffrey Weiner | 4 Relationships | Major Automotive Companies Inc | 54 |
| Steven Hornstock | 13 Relationships | Major Automotive Companies Inc | 62 |

View All Board Members

**MAJOR AUTOMOTIVE COMPANIES INC. EXECUTIVE COMMITTEES***

| Committee Name | Chairperson | Board Relationships | Members |
|---|---|---|---|
| Audit Committee | Alan A. Pearson | 4 Relationships | 3 Executives |

View Committee Details

*Data is at least as current as the most recent Definitive Proxy.

ADS BY GOOGLE

**State Farm Car Insurance**
Sign Up With America's #1 Car Insurer. Get A Free Quote Online.
www.statefarm.com

**Project Management Cert.**
Become a Project Mgmt Professional. PMP® & CAPM® Courses, 100% Online.
VillanovaU.com/ProjectManagement

**Online Market Research**
Actionable Customer Insights via Private Online Communities.
thinkpassenger.com



**CNNMoney**
A Service of CNN, Fortune & Money

Register   Log In   CNN

| Home | Video | Business News | Markets | Term Sheet | Economy | Tech | Personal Finance | Small Business | Leadership | | Like | 38K |

# Crisis on Dealers' Row

**Harold Bendell**

3 of 4   Back   Next

**President**
**MajorWorld used cars**

"I'm usually a pretty mellow guy," Harold Bendell said, "But now I'm pissed. That's why I'm talking."

We were outside in a gravel lot the size of a shopping mall parking lot. Around us, bumper-to-bumper used cars were grouped by make and model. Bendell owns several new-car dealerships, but this is where the real action is. MajorWorld boasts of being the largest used-car dealership in the world.



He took me out there to show me why he thought General Motors was in trouble. Inside his used Chevrolet Equinoxes, door trim was chafing off. Seats had stains that wouldn't come out. Inside his used Pontiac cars, he said, the steering felt loose after only about 30,000 miles.

We should be careful about giving these companies money, he said, since they still didn't seem to grasp what the real problem was.

"They've been promising me the greatest cars in the world for the last 25 or 30 years, and I've been listening to them," Bendell had said to me earlier in his office. He also owns a Chevrolet dealership that faces the boulevard.

"Don't give me this Car & Driver s---!" he said. "This car got voted Car & Driver Car of the year.' That's today. I loved my wife in the beginning. Eight years later... eh."

A GM spokeswoman told me later that the company is confident in the long-term durability of the products it's making today.

Things have been rough for GM dealers for a long time, Bendell said. "For the last four or five years, the average Chevrolet dealer has been in the toilet."

Unfortunately, somewhat improved quality hasn't led to greatly increased sales.

"The cars are better, no question about that," he said. "You don't have the warranty work to dip into and just say, 'I'm going to change transmissions all day.'" They also look nicer, but in the used car lot, Toyotas and Hondas end up looking better and selling for more.

He's concerned about GM's long-term viability, but Bendell is not sure it would be smart for taxpayers to just hand them a check. GM had recently decided to delay incentive payments it was supposed to make to dealers. He worried that GM might never be able to pay him that money.

"I just gave somebody a $6,000 rebate on a Tahoe. Am I going to see that $6,000?" he said. "I don't know."

On that question, another GM spokesperson told me Bendell doesn't need to worry. He'll get his money in early December.

If Congress does vote to give the dealers a bailout, it's important to him, as a taxpayer, that he knows what's being done with that money.

"I want to be there if I give you $25 billion," he said "I'm going to sleep with you. You, me and the fishes. I want to watch my money."

## More Autos
- The Big 3 Depression risk
- Consumers will suffer if GM goes under
- What's really killing Detroit



Trade free for 30 days + get up to $500.

OPEN AN ACCOUNT TODAY
GET STARTED

 Ameritrade

## More Galleries

 **America's most loyal bank customers**
At a time when many frustrated consumers are giving up on their banks, some remain loyal to their financial institutions. Despite acquisitions and the rise of online banking, these seven customers have held onto the same bank account for at least 40 years. More

**U.S. Marines: Use less oil, be more lethal**
At a desert base in California, the Marines are testing devices that may help them become a deadlier, more self-reliant fighting force. More

**Inside Burt Reynolds' Florida home**
A Florida lawsuit claims the 75-year-old movie star stopped making payments on his luxurious waterfront estate. He is now facing foreclosure. More

Sponsored Links

**Hot Gold Stock - GTSO**
GTSO Gold play in China as Precious Metals Head Higher.

**2011 Top Tech Stock EMBA**
Make Money On The Hottest Tech Penny Stock Today. Invest Now

**2011 Toyota Camry**
Discover the 2011 Camry Online! View MPG, Pricing, Specs & More.

**Mortgage Rates Hit 2.50%**
White House Program Cuts Up To $1000 Off Monthly Mortgage Payments! (3.1% APR)

Buy a link here

**Special Offer**

Crisis on Dealers' Row - Harold Bendell (3) - CNNMoney.com

NEXT: Brian Benstock

Row     Park     Bendell     Benstock

Last updated December 26 2008: 9:02 AM ET

Email | Print | ⚙ Digg this story | 📶 RSS

Sponsored Links

**Hot Gold Stock - GTSO**
GTSO Gold play in China as Precious Metals Head Higher.
www.GtsoGold.com

**2011 Top Tech Stock EMBA**
Make Money On The Hottest Tech Penny Stock Today. Invest Now
www.greengainers.com/emba/

**2011 Toyota Camry**
Discover the 2011 Camry Online! View MPG, Pricing, Specs & More.
www.Toyota.com/Camry

Buy a link here

CNN Money

| About CNNMoney | Content | Magazines | Site Tools | Stay Connected |
|---|---|---|---|---|
| Contact Us | Fortune Magazine | Subscribe to Fortune | Site Map | My Account |
| Advertise with Us | Money Magazine | Subscribe to Money | Watchlist | Mobile Site & Apps |
| User Preferences | Business News | Give the Gift of Fortune | Search Jobs | Facebook |
| Career Opportunities | Markets | Give the Gift of Money | Real Estate Search | Twitter |
| Conferences | Term Sheet | Reprints | Mortgage and Savings Center | LinkedIn |
| Business Leader Council | Economy | Special Sections | Calculators | YouTube |
| | Tech | Magazine Customer Service | Widgets | RSS Feeds |
| | Personal Finance | | Corrections | Newsletters |
| | Small Business | | Market Data Alerts | Tumblr |
| | Video | | News Alerts | |

Market indexes are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer LIBOR Warning: Neither BBA Enterprises Limited, nor the BBA LIBOR Contributor Banks, nor Reuters, can be held liable for any irregularity or inaccuracy of BBA LIBOR. Disclaimer. Morningstar: © 2011 Morningstar, Inc. All Rights Reserved. Disclaimer The Dow Jones IndexesSM are proprietary to and distributed by Dow Jones & Company, Inc. and have been licensed for use. All content of the Dow Jones IndexesSM © 2011 is proprietary to Dow Jones & Company, Inc. Chicago Mercantile Association. The market data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. FactSet Research Systems Inc. 2011. All rights reserved. Most stock quote data provided by BATS.

© 2011 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy. Ad choices ▷.

# EXHIBIT F

**STEINBERG, STECKLER & PICCIURRO**
CERTIFIED PUBLIC ACCOUNTANTS
462 SEVENTH AVENUE
NEW YORK, N.Y. 10018

(212) 695-1300 — FAX (212) 695-1591

To:        Board of Trustees – Local 868 Pension Fund

From:     Steinberg, Steckler & Picciurro, Certified Public Accountants

Subject:  Major Chevrolet Inc. (Sales)
          Audit Period: January 1, 2002 to December 31, 2007

Date:     August 5, 2009

We have performed the procedures enumerated below, which were agreed to by the Trustees of the Local 868 Pension Fund (specified users of this report), solely to assist you with respect to determining whether or not proper Pension Fund contributions required under the Collective Bargaining Agreement (CBA) were made by participating employers. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below, either for the purpose for which this report has been requested or for any other purpose.

The procedures and the associated findings are as follows:

(1) Read applicable collective bargaining agreement to determine the definition of covered employment, the contribution rates in effect and the basis on which contributions are determined.

(2) Compare employer payroll records (including payroll tax returns filed with the government) to voluntary contribution report forms and list differences in months reported, as well as employees not reported.

(3) For those employees not reported, ascertain the employee's job description to determine whether the employee was working in covered employment.

(4) Review cash disbursement records to determine whether other wage type payments were made or whether employer was utilizing "contract" labor.

(5) Discuss discrepancies with employer's representative.

(6) Prepare a report detailing our findings.

MEMBER
AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS
DIVISION FOR CPA FIRMS, PRIVATE COMPANIES PRACTICE SECTION

NEW YORK STATE SOCIETY OF CERTIFIED PUBLIC ACCOUNTANTS

The agreed upon procedures were performed for the period 01/01/02 to 12/31/07 on Major Chevrolet Inc., a contributing employer to the Local 868 Pension Fund, to determine the accuracy and timeliness of pension fund contributions required under the Collective Bargaining Agreement ("CBA"). The auditor was able to determine the dates of employment of various employees and compared it with the payments remitted by the employer. The auditor was also able to ascertain the employees' job descriptions to determine which employees were engaged in covered employment and which employees were excluded by the CBA. The audit period is covered by three Collective Bargaining Agreements. One agreement for the period January 29, 2001 through January 29, 2004, another agreement for the period January 29, 2004 through January 29, 2007 and the last agreement for the period January 29, 2007 through January 29, 2010.

**The CBA Provides that:**

- The employer recognizes the Union as the exclusive bargaining representative for all full-time commissioned salespersons, excluding all clerical employees, professional employees, managerial employees, confidential employees, all other employees and guards and supervisors.

- The employer agrees to pay $85.00 per month, per employee, towards the Union's pension plan for each employee employed by the Company for at least one year, consecutively. Employer must pay $85.00 per month on the 13th month of consecutive employment.

**Scope Limitation:**

- The auditor was not given access to the cash disbursement records, general ledger and corporate tax returns. Consequently, we could not determine whether the employer was utilizing contract labor.

The employer was found to have made the following errors and/or omissions:

- Failed to make contributions for certain employees engaged in covered work as defined in the CBA.

- Failed to remit pension contributions after one year of consecutive employment.

STEINBERG, STECKLER & PICCIURRO

The auditor discussed the above findings with Mr. Eric Keltz, attorney for the company, which are summarized below. The details of our findings are included in the attached schedules.

|  | Paid | Audited | Difference |
|---|---|---|---|
| Pension Fund | $ 167,875.00 | $ 338,980.00 | $ 171,105.00 |

The first column represents the employer's actual contributions. The second column represents the amount required to be paid under the Collective Bargaining Agreement. The third column represents our findings.

We were not engaged to, and did not perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the specified users listed above and is not intended to be and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

Our procedures were performed solely to assist you in evaluating the accuracy of the reports submitted to you by the employer and our report is not to be used for any other purpose.

STEINBERG, STECKLER & PICCIURRO

FROM                                                (THU)AUG 11 2011 17:05/ST.17:03/No.7800000038 P  5

## STEINBERG, STECKLER & PICCIURRO
### CERTIFIED PUBLIC ACCOUNTANTS
462 SEVENTH AVENUE
NEW YORK, N.Y. 10018

(212) 695-1300 – FAX (212) 695-1591

| | |
|---|---|
| To: | Board of Trustees – Local 917 Health Fund and Local 868 Pension Fund |
| From: | Steinberg, Steckler & Picciurro, Certified Public Accountants |
| Subject: | Major Chevrolet Inc. (Shop) Audit Period: January 1, 2002 to December 31, 2007 |
| Date: | August 3, 2009 |

We have performed the procedures enumerated below, which were agreed to by the Trustees of the Local 917 Health Fund and Local 868 Pension Fund (specified users of this report), solely to assist you with respect to determining whether or not proper Health and Pension fund contributions required under the Collective Bargaining Agreement (CBA) were made by participating employers. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below, either for the purpose for which this report has been requested or for any other purpose.

The procedures and the associated findings are as follows:

(1) Read applicable collective bargaining agreement to determine the definition of covered employment, the contribution rates in effect and the basis on which contributions are determined.

(2) Compare employer payroll records (including payroll tax returns filed with the government) to voluntary contribution report forms and list differences in months reported, as well as employees not reported.

(3) For those employees not reported, ascertain the employee's job description to determine whether the employee was working in covered employment.

(4) Review cash disbursement records to determine whether other wage type payments were made or whether employer was utilizing "contract" labor.

(5) Discuss discrepancies with employer's representative.

(6) Prepare a report detailing our findings.

MEMBER
AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS
DIVISION FOR CPA FIRMS, PRIVATE COMPANIES PRACTICE SECTION
NEW YORK STATE SOCIETY OF CERTIFIED PUBLIC ACCOUNTANTS

The agreed upon procedures were performed for the period 01/01/02 to 12/31/07 on Major Chevrolet Inc., a contributing employer to the Local 917 Health Fund and Local 868 Pension Fund, to determine the accuracy and timeliness of health and pension fund contributions required under the Collective Bargaining Agreement ("CBA"). The auditor was able to determine the dates of employment of various employees and compared it with the payments remitted by the employer. The auditor was also able to ascertain the employees' job descriptions to determine which employees were engaged in covered employment and which employees were excluded by the CBA. The audit period is covered by two Collective Bargaining Agreements. One agreement for the period April 1, 2002 through March 31, 2005 and the other agreement for the period April 1, 2005 through March 31, 2008.

**The CBA Provides that:**

- The employer recognizes the Union as the exclusive bargaining representative for all of its employees working the Shop operated as part of the Company's business.

- The employer agrees to continue the current plan of benefits of the Local 917 Health Fund with a maximum 5% cap per year to be maintained by the employer, with cost of said medial to be added to employee's wages, then deducted as such to cover same.

- The employer agrees to contribute to the Local 868 Pension Fund, at rates specified in the CBA, on behalf of each eligible employee.

- After the completion of the trial period all new employees shall be deemed regular employees of the company and entitled to all the benefits of present employees except as otherwise expressly provided herein.

- Health and pension contributions will be made for all new employees after they have completed six months of employment.

**Scope Limitation:**

- The CBAs' did not specify the rates for the Local 917 Health Fund. Consequently, the auditor accepted the rates provided by the fund office.

- We were not provided with a CBA covering the period January 1, 2002 through March 31, 2002. Consequently, the auditor applied the provisions found in the CBA's provided.

- The auditor was not given access to the cash disbursement records, general ledger and corporate tax returns. Consequently, we could not determine whether the employer was utilizing contract labor.

STEINBERG, STECKLER & PICCIURRO

The employer was found to have made the following errors and/or omissions:

- Failed to remit contributions for all covered employees.

- Failed to remit health and pension contributions after six months of employment.

The auditor discussed the above findings with Mr. Eric Keltz, attorney for the company, which are summarized below. The details of our findings are included in the attached schedules.

|  | Paid | Audited | Difference |
|---|---|---|---|
| Health Fund | $ 793,636.14 | $ 1,898,922.54 | $ 1,105,286.40 |
| Pension Fund | 173,650.00 | 377,860.00 | 204,210.00 |
| Total | $ 967,286.14 | $ 2,276,782.54 | $ 1,309,496.40 |

The first column represents the employer's actual contributions. The second column represents the amount required to be paid under the Collective Bargaining Agreement. The third column represents our findings.

We were not engaged to, and did not perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the specified users listed above and is not intended to be and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

Our procedures were performed solely to assist you in evaluating the accuracy of the reports submitted to you by the employer and our report is not to be used for any other purpose.

FROM                                          (THU) AUG 11 2011 17:05/ST. 17:03/No. 7800000038 P 8

## STEINBERG, STECKLER & PICCIURRO
### CERTIFIED PUBLIC ACCOUNTANTS
462 SEVENTH AVENUE
NEW YORK, N.Y. 10018

(212) 695-1300 — FAX (212) 695-1591

To:        Board of Trustees – Health Fund 917, Local 868 Welfare Fund and Local 868
           Pension Fund

From:      Steinberg, Steckler & Picciurro, Certified Public Accountants

Subject:   Major Dodge Inc.
           Audit Period: January 1, 2003 to December 31, 2007

Date:      August 3, 2009

We have performed the procedures enumerated below, which were agreed to by the
Trustees of the Health Fund 917, Local 868 Welfare Fund and Local 868 Pension Fund
(specified users of this report), solely to assist you with respect to determining whether or
not proper Health, Welfare and Pension contributions required under the Collective
Bargaining Agreement (CBA) were made by participating employers. This engagement
to apply agreed-upon procedures was performed in accordance with standards established
by the American Institute of Certified Public Accountants. The sufficiency of the
procedures is solely the responsibility of the specified users of the report. Consequently,
we make no representation regarding the sufficiency of the procedures described below,
either for the purpose for which this report has been requested or for any other purpose.

The procedures and the associated findings are as follows:

(1) Read applicable collective bargaining agreement to determine the definition of
    covered employment, the contribution rates in effect and the basis on which
    contributions are determined.

(2) Compare employer payroll records (including payroll tax returns filed with the
    government) to voluntary contribution report forms and list differences in months
    reported, as well as employees not reported.

(3) For those employees not reported, ascertain the employee's job description to
    determine whether the employee was working in covered employment.

(4) Review cash disbursement records to determine whether other wage type payments
    were made or whether employer was utilizing "contract" labor.

(5) Discuss discrepancies with employer's representative.

(6) Prepare a report detailing our findings.

MEMBER
AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS
DIVISION FOR CPA FIRMS, PRIVATE COMPANIES PRACTICE SECTION

NEW YORK STATE SOCIETY OF CERTIFIED PUBLIC ACCOUNTANTS

The agreed upon procedures were performed for the period 01/01/03 to 12/31/07 on Major Dodge Inc., a contributing employer to the Health Fund 917, Local 868 Welfare Fund and Local 868 Pension Fund to determine the accuracy and timeliness of health, welfare and pension fund contributions required under the Collective Bargaining Agreement ("CBA"). The auditor was able to determine the dates of employment of various employees and compared it with the payments remitted by the employer. The auditor was also able to ascertain the employees' job descriptions to determine which employees were engaged in covered employment and which employees were excluded by the CBA. The audit period is covered by two Collective Bargaining Agreements. One agreement for the period February 1, 2004 through January 31, 2007 and the other for the period February 1, 2007 through January 31, 2010.

### The CBA Provides that:

- The employer recognizes the Union as the exclusive bargaining representative for all of its employees working in the Shop operated as a part of the Company's business.

- The employer agrees to participate in the Local 917 Health Fund and shall contribute to said Fund for each of its employees covered by this Agreement. The employer agrees to pay each January 1st hereafter any increase necessary to maintain the group coverage benefits set forth above for its employees subject to a maximum increase of 10% in contributions.

- An employee who voluntarily opts out of coverage will be paid at the rate specified in the CBA.

- The employer agrees to contribute to the Local 868 Pension Fund at rates specified in the CBA.

- Contributions will be made for all new employees after they have completed six months of employment.

### Scope Limitation:

- The CBAs' did not specify the rates for the Local 917 Health Fund and Local 868 Welfare Fund. Consequently, the auditor accepted the rates provided by the fund office.

- The requested audit period was January 1, 2002 through December 31, 2007. However, the employer could not provide us with any computer generated payroll reports detailing wages, hours and months worked for the period January 1, 2002 through December 31, 2002. Consequently, we did not apply procedures to this period.

STEINBERG, STECKLER & PICCIURRO

<u>Scope Limitation</u> (Continued)

- There was no CBA covering the period January 1, 2003 through January 31, 2004.  Consequently, the auditor applied the provisions found in the CBA's provided.

- The auditor was not given access to the cash disbursement records, general ledger and corporate tax returns. Consequently, we could not determine whether the employer was utilizing contract labor.

**The employer was found to have made the following errors and/or omissions:**

- Failed to remit all contributions for all covered employees.

- Failed to remit contributions after six months of employment.

The auditor discussed the above findings with Mr. Eric Keltz, attorney for the company, which are summarized below. The details of our findings are included in the attached schedules.

|  | Paid | Audited | Difference |
|---|---|---|---|
| Health Fund | $ 289,781.00 | $ 709,193.00 | $ 419,412.00 |
| Pension Fund | 76,355.00 | 126,880.00 | 50,525.00 |
| Total | $ 366,136.00 | $ 836,073.00 | $ 469,937.00 |

The first column represents the employer's actual contributions. The second column represents the amount required to be paid under the Collective Bargaining Agreement. The third column represents our findings.

**Observation:**
Starting October 2004 through June 2006, the employer made pension contributions for Jose Padilla (SSN 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).  According to the company's payroll records, his date of hire was July 30, 2006.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

STEINBERG, STECKLER & PICCIURRO

This report is intended solely for the information and use of the specified users listed above and is not intended to be and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

Our procedures were performed solely to assist you in evaluating the accuracy of the reports submitted to you by the employer and our report is not to be used for any other purpose.

STEINBERG, STECKLER & PICCIURRO

# EXHIBIT G

1

1

2          UNITED STATES DISTRICT COURT

3          EASTERN DISTRICT OF NEW YORK

4          ------------------------------------------X
           JOHN VACCA, DAVID PEREZ, KIRK CONAWAY, And
5          ROY KOHN as Trustees of THE HEALTH FUND 917
           and the LOCAL 868 IBT PENSION FUND; HEALTH
6          FUND 917 and the LOCAL 868 IBT PENSION FUND,
                                        Plaintiffs,
7                      -against-        10 CV 2736
           THE MAJOR AUTOMOTIVE COMPANIES, INC., d/b/a
8          MAJOR CHEVROLET, INC., and MAJOR DODGE,
           INC.; HAROLD BENDEL; MAJOR CHEVROLET INC;
9          and MAJOR DODGE, INC. and HAROLD BENDEL,
                                        Defendants.
10         ------------------------------------------X

11

12                            3000 Marcus Avenue

13                            Lake Success, New York

14

15                            July 11, 2011

16                            3:10 P.M.

17

18              DEPOSITION of STEINBERG, STECKLER &

19         PICCIURRO, by DAVID MOSKOWITZ, a Non-party

20         witness, taken pursuant to The Federal Rules of

21         Civil Procedure, and Subpoena, held at the

22         above-mentioned time and place, before Patricia

23         Wor, a Notary Public of the State of New York.

24

25

1                        D. Moskowitz

2      their response is as well.

3          Q.   But that's even before you do the audit

4      findings?

5          A.   Usually before we do the audit findings.

6      We try to avoid as many discrepancies, possible

7      discrepancies as we can.  Sometimes it's not

8      feasible for us or the employer is just not

9      willing to, you know, answer certain questions.

10         Q.   What about union dues, that would be

11     included in the payroll records that the employer

12     was deducting union dues for certain employees,

13     correct?

14         A.   It's not always correct.  Sometimes

15     somebody could be doing covered work on the Funds

16     contribution report, does not mean dues are being

17     taken out from their salary.  We don't audit for

18     dues.  We just audit for the Funds.

19         Q.   Was that the case with Major, that the

20     payroll records indicated that union dues were

21     taken out?

22         A.   I don't recall that, because, again,

23     Mr. Rodas did most of that work.

24         Q.   Would that be an indication or a factor

25     in determining whether or not somebody is in the

# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

NICHOLAS BERNHARD, RALPH NATALE,                    10 CV 2736
KIRK CONAWAY, and ROY KOHN as Trustees
of THE HEALTH FUND 917 and the LOCAL 868
IBT PENSION FUND; HEALTH FUND 917
and the LOCAL 868 IBT PENSION FUND,

                                                    NOTICE OF
                                                    DEPOSITION

                        Plaintiffs,

            v.

THE MAJOR AUTOMOTIVE COMPANIES, INC., d/b/a
MAJOR CHEVROLET, INC., and MAJOR DODGE, INC.;
HAROLD BENDEL; MAJOR CHEVROLET INC; and
MAJOR DODGE, INC. and HAROLD BENDEL

                        Defendants.

---------------------------------------------------------------------------X

SIR:

        PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Defendants will take the deposition of an agent or agents designated by Plaintiffs,

Nicholas Bernhard, Ralph Natale, Kirk Conaway, and Roy Kohn as Trustees of the Health Fund

917 and the Local 868 IBT Pension Fund, Health Fund 917 and the Local 868 IBT Pension Fund

("Funds") who have knowledge of their claims in the above lawsuit.  Specifically, the

deponent(s) should have knowledge of how the Funds calculated the level and period of

contributions for each individual for which the Funds seek contributions.  The deposition will

take place before a Notary Public or other person authorized to administer oaths at 10:00 AM on

June 29, 2011, at the offices of Milman Labuda Law Group PLLC, 3000 Marcus Avenue, Suite

3W8, Lake Success, New York.  The oral examination will continue from day to day until

completed.



Dated: June 24, 2011
       Lake Success, New York

Joseph M. Labuda, Esq. (JL-5213)
MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiff
3000 Marcus Avenue, Suite 3W8
Lake Success, New York  11042
(516) 328-8899

# EXHIBIT I

1

2      UNITED STATES DISTRICT COURT

3      EASTERN DISTRICT OF NEW YORK

4      ------------------------------------------------X
       JOHN VACCA, DAVID PEREZ, KIRK CONAWAY, And
5      ROY KOHN as Trustees of THE HEALTH FUND 917
       and the LOCAL 868 IBT PENSION FUND; HEALTH
6      FUND 917 and the LOCAL 868 IBT PENSION FUND,
                                           Plaintiffs,
7                     -against-       10 CV 2736
       THE MAJOR AUTOMOTIVE COMPANIES, INC., d/b/a
8      MAJOR CHEVROLET, INC., and MAJOR DODGE,
       INC.; HAROLD BENDEL; MAJOR CHEVROLET INC;
9      and MAJOR DODGE, INC. and HAROLD BENDEL,
                                           Defendants.
10     ------------------------------------------------X

11

12                                3000 Marcus Avenue

13                                Lake Success, New York

14

15                                July 8, 2011

16                                10:10 A.M.

17

18            DEPOSITION of JOANN EMMONS, a 30(b)(6)

19     witness, taken pursuant to The Federal Rules of

20     Civil Procedure, and Notice, held at the

21     above-mentioned time and place, before Patricia

22     Wor, a Notary Public of the State of New York.

23

24

25

J. Emmons

particular employee was determined to be in the

bargaining unit and, therefore, entitled to

pension and/or health or welfare benefits?

A.   Yes.

Q.   Do you know how it is that the Funds

calculated the level and period of contributions

for each individual listed in the most recently

revised audit findings?

A.   What do you mean by level of

contribution, the amount?

Q.   Yes, the amount.

A.   Repeat the question.  What are you

asking?

Q.   Well, I'll just repeat it.

Do you know how it is that the Funds

calculated the level and period of time of

contributions for each individual for which the

Funds seek contributions?

A.   How the amount of the contribution was

calculated?

Q.   I think that question asked for two

different things, which is the level or amount of

contributions such as -- because there's

different amounts of contributions to be paid

48

J. Emmons

1  depending upon somebody's job title, correct?

2  

3  Let's say, for instance, Sales versus Shop.

4  A.   Well, yeah, it's based on each employer,

5  whatever the employer's contribution rate is, and

6  that level is determined once a year, that

7  amount.

8  Q.   Correct, as per the contract and the

9  trust agreement and the --

10  A.   Well, no.  No.  The amount -- the

11  actual amount would be determined by the Funds'

12  consultant or actuary and presented to the Board

13  of Trustees and they'll review that information

14  and determine what the appropriate contribution

15  rate is.

16  Q.   Is it fair to say that the first year of

17  the contract between the employer and the union

18  is going to set a specific rate for these various

19  pension and/or health or welfare fund

20  contributions and then the year after that it's

21  set by the actuaries?

22  A.   It depends.  Generally the first year of

23  the contract should have the appropriate amount.

24  Q.   Because -- I'm sorry, go ahead.

25  A.   It depends on what's subsequent to that,

----

J. Emmons

whether it's an open-ended contract, whether it
calls for a percentage increase in the contract,
whether it calls for a specific level of
benefits.  Each contract is different.

    Q.   Right, and --

    A.   I'm talking specifically for health now.

    Q.   Okay, and that rate is determined
depending on who the employee is working for,
correct?

    A.   Who the employee?

    Q.   Yes.

    A.   As I said, each employer has a specific
contribution rate for all of the employees listed
under that employer.

    Q.   Correct.  So it depends on -- in terms
of determining the level of contribution or the
amount that's due, it depends on who that
employee is working for and then it also depends
on what that employee does because -- is there a
different rate between, let's say, Shop and
Sales?

    A.   There could be.  I don't recall off the
top of my head if they're in the same class.

    Q.   I'll make a representation to you just

J. Emmons

in terms of answering this question that there
are, I think, three separate contracts at issue
here; one is the Dodge contract and then one is
the Chevy contract for Shop and then there's a
separate agreement for Chevy Sales.

    A.   Yes, I know.

    Q.   Right?  So if somebody works for Dodge,
they are being paid -- and they're covered under
the contract, everybody that works and is covered
under that contract is going to receive the same
pension rate for any particular year, correct?

    A.   Yes.

    Q.   And those Dodge employees are also going
to receive a certain set rate for health benefits
for any given year depending on whether or not
they're family or they're single coverage,
correct?

    A.   Yes.

    Q.   And with Chevy Shop the same applies,
correct?

    A.   Yes.

    Q.   And then with Chevy Sales the same thing
applies, correct?

    A.   Yes.

J. Emmons

1    Q.   But somebody who works in Chevy Shop may

2 not receive the same level of benefits as the

3 employee that is working in Chevy Sales, correct?

4

5    A.   Yes.

6    Q.   So there's got to be made a

7 determination as to whether or not -- at least

8 whether or not the employee was working under the

9 Chevy Shop contract or the Chevy Sales contract,

10 correct?

11    A.   Yes.

12    Q.   So that was one issue that I was just

13 asking you about, was the level of contributions.

14    Do you know how it is that the Funds

15 calculated the level of contributions for any

16 particular employee?  Yes, that was my question.

17    A.   And, again, it's determined by the

18 employer, and if you're asking how it's

19 specifically calculated, I refer back to my

20 earlier answer.

21    Q.   Well, no.  What I was asking you is more

22 like do you know how it is or was determined by

23 the Funds whether or not the employee was in

24 either one of these -- covered under either one

25 of these three contracts and/or how the auditors

J. Emmons

1  made that determination or whoever made that

2  determination?

3          MS. BRUNO:  Can we answer those both

4      separately since they're two separate

5      questions?  Could you ask the first one and

6      then come back to the second?

7          MR. LABUDA:  Okay, just read the first

8      part of the question.

9      Q.    If we just limit the question to just

10  the auditors, the question I just asked, what

11  would your answer be?

12      A.    How did the auditor -- let me get that I

13  understand your question correctly first.

14      Q.    Okay.

15      A.    How it was that the auditors determined

16  what the contribution rate would be for a

17  salesperson versus a shop person in Chevy?

18      Q.    No, not so much what the contribution

19  rate is.  That's easy enough.  You look at the

20  contract or the trust agreement that sets the

21  rate or whatever it is, the auditor's opinion

22  letter, but what I was asking is do you know how

23  it is that the auditors made the determination

24  whether or not somebody is either classified

# EXHIBIT J

Case 2:10-cv-02736-SJF-ETB   Document 50   Filed 09/02/11   Page 54 of 55 PageID #: 795

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 8, 2011.

Selected Entity Name: MAJOR DODGE, INC.
Selected Entity Status Information

**Current Entity Name:** MAJOR DODGE, INC.
**Initial DOS Filing Date:** MARCH 16, 1990
**County:** QUEENS
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** INACTIVE - Merged Out (Nov 25, 2003)

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
MAJOR DODGE, INC.
43-40 NORTHERN BOULEVARD
LONG ISLAND CITY, NEW YORK, 11101
**Chairman or Chief Executive Officer**
HAROLD BENDELL
46-01 NORTHERN BOULEVARD
LONG ISLAND CITY, NEW YORK, 11101
**Principal Executive Office**
MAJOR DODGE, INC.
43-40 NORTHERN BOULEVARD
LONG ISLAND CITY, NEW YORK, 11101
**Registered Agent**
NONE

This office does not record information regarding the names
and addresses of officers, shareholders or directors of
nonprofessional corporations except the chief executive
officer, if provided, which would be listed above.
Professional corporations must include the name(s) and
address(es) of the initial officers, directors, and shareholders
in the initial certificate of incorporation, however this
information is not recorded and only available by viewing

Case 2:10-cv-02736-SJF-ETB   Document 50   Filed 09/02/11   Page 55 of 55 PageID #: 796

the certificate.

## *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| OCT 11, 1991 | Actual | MAJOR DODGE, INC. |
| MAR 16, 1990 | Actual | MAJOR CHRYSLER-PLYMOUTH, INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us